[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 282.]

NORTHWESTERN OHIO BUILDING & CONSTRUCTION TRADES COUNCIL ET AL., APPELLEES, *v.* CONRAD, ADMR., BUREAU OF WORKERS' COMPENSATION ET AL., APPELLANTS.

[Cite as *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad*, 2001-Ohio-190.]

*Workers' compensation—Use of premium contributions from the State Insurance Fund for payment of administrative and performance incentive fees to managed care organizations certified by the Bureau of Workers' Compensation does not violate Section 35, Article II of the Ohio Constitution.*

(No. 00-216—Submitted January 10, 2001—Decided July 18, 2001.)

APPEAL from the Court of Appeals for Franklin County, No. 98AP-1287.

————————————

SYLLABUS OF THE COURT

The use of premium contributions from the State Insurance Fund for the payment of administrative and performance incentive fees under Ohio Adm.Code 4123-6-13 to managed care organizations certified by the Bureau of Workers' Compensation under the Health Partnership Program does not violate Section 35, Article II of the Ohio Constitution.

————————————

COOK, J.

{¶ 1} In 1993, the General Assembly amended Ohio's workers' compensation scheme to create the Health Partnership Program ("HPP"), a comprehensive managed care program administered by appellant, the Bureau of Workers' Compensation ("BWC"), to provide medical services to employees for their compensable injuries or occupational diseases. See 145 Ohio Laws, Part II,

2990, 3088-3093; R.C. 4121.44 and 4121.441. We have already determined that the managed care organizations ("MCOs") certified to perform these services under the HPP do not unconstitutionally usurp the state's power and authority to administer the State Insurance Fund ("SIF") and determine the terms and conditions of payments to injured claimants. *State ex rel. Haylett v. Ohio Bur. of Workers' Comp.* (1999), 87 Ohio St.3d 325, 331, 720 N.E.2d 901, 906.

{¶ 2} Now we are asked to decide whether the BWC's use of SIF proceeds to pay administrative and performance-incentive fees to certified MCOs under the HPP violates either the Revised Code or Section 35, Article II of the Ohio Constitution. The court of appeals determined that the BWC's use of fund proceeds for administrative and performance incentive payments is neither legislatively authorized nor constitutional. For the following reasons, however, we disagree.

## I. MCOs and the HPP

{¶ 3} As we noted in *Haylett, supra,* MCOs are an integral part of the HPP established by the General Assembly. *Id.*, 87 Ohio St.3d at 326, 720 N.E.2d at 903. The MCOs certified by the BWC under Ohio Adm.Code Chapter 4123-6 are private entities that perform medical-management and cost-containment services under contract with the BWC. *Id.* Employers covered by the SIF select an MCO from a list of BWC-certified MCOs, or the BWC will assign an MCO to employers who fail to make a selection. Ohio Adm.Code 4123-6-051(A); 4123-6-052(A). Each MCO is associated with a network of health-care providers that can offer a full range of medical services to injured workers. *Id.*

{¶ 4} Once certified by the BWC and selected by or assigned to an employer, MCOs manage the medical aspect of each workers' compensation claim. Ohio Adm.Code 4123-6-043(B) and (F); *Haylett*, 87 Ohio St.3d at 329, 720 N.E.2d at 905. An MCO is the entity responsible for initially authorizing medical care to an injured party. Ohio Adm.Code 4123-6-043(F); 4123-6-045(D). "The MCO must promptly notify the BWC of an employee's industrial injury. While the BWC

determines the compensability of a claim, the MCO works 'in conjunction with the employer, employee, attending physician, and the [BWC to] seek a course of medical or rehabilitative treatment that promotes a safe return to work.' " *Haylett,* 87 Ohio St.3d at 329, 720 N.E.2d at 905, citing Ohio Adm.Code 4123-6-043(B). "During the life of a medical claim, the MCO performs utilization reviews * * *. Utilization reviews ensure that only medical services and supplies that are medically necessary for the diagnosis and treatment of allowed conditions and that are causally related to those conditions will be considered for payment. The MCO must submit all medical bills to the BWC.    * * * The BWC then authorizes payment and sends it to the MCO for reimbursement to the individual provider." (Citation omitted.) *Id.*

{¶ 5} The HPP also contains a mandatory dispute resolution program available to employees, employers, and providers. *Id.*, citing Ohio Adm.Code 4123-6-16. "Any decision by an MCO regarding treatment or payment is nonbinding and subject to multiple levels of review. The final decision as to any aspect of the claim lies with the Industrial Commission." *Id.* at 330, 720 N.E.2d at 905. In addition to these procedural safeguards, the HPP requires the BWC to supervise the certified MCOs and to monitor their performance continually. *Id.*

II. Administrative and Performance Incentive Payments to MCOs

{¶ 6} To compensate the MCOs for their medical-management and cost-containment services, the administrator promulgated a rule providing for certain payments to be made to the MCOs. The *source* of the payments made to MCOs by the BWC under this administrative rule is the focus of the instant dispute.

{¶ 7} Ohio Adm.Code 4123-6-13 provides:

"(B) The bureau shall pay an MCO an administrative fee for its medical management and administrative services in a manner determined by the administrator. The administrative fee may be subject to a disincentive penalty based upon the failure of the MCO to meet predetermined performance criteria set

forth in the MCO contract. The bureau may pay an MCO a performance payment and may pay an incentive payment.

"(C) In establishing performance measures, the bureau shall evaluate an MCO's performance based upon but not limited to:

"(1) Quality performance measures that may include return to work rates and reinjury rates.

"(2) Total cost measures that may include average total paid cost, average incurred cost, and lost-time claims to total claims ratio.

"(3) Change in cost measures that may include change in average total paid cost, change in average incurred cost, and change in lost-time to total claims ratio.

"(4) Customer satisfaction that may include in-network utilization rate and employee, employer, and provider satisfaction surveys."

{¶ 8} The parties here stipulate that both the administrative and performance-incentive payments authorized by Ohio Adm.Code 4123-6-13 are paid out of employer premium contributions, "with the total remuneration available to each [MCO] being a fixed percentage of the premiums paid by the employers which have selected or been assigned to it." The parties further stipulate that "[t]he total percentage of premium allocated for payment of fees and performance incentive payments is not fixed by rule, but is established by the BWC or the Administrator and may be periodically adjusted."

{¶ 9} Douglas Maser, the BWC's Chief Medical Management and Cost Containment Officer in 1997, testified at a deposition about how the administrative and performance-incentive fees provided under Ohio Adm.Code 4123-6-13 are calculated. Maser testified that at the time of his deposition, the "base administrative fee" was set at three percent. Accordingly, a hypothetical MCO with one hundred employers enrolled in it would receive a base administrative fee from the SIF equal to three percent of the premiums paid by those one hundred employers. As of January 1, 1998, the phase-in of the HPP was complete and the

base administrative fee for each participating MCO was increased to five percent of premium.

{¶ 10} The performance-incentive payments, Maser testified, are payable to an MCO "over and above its administrative fee" and calculated on an "MCO-by-MCO" basis. At the time of Maser's deposition, a total of an additional three percent of premium—over and above the three percent administrative fee—was potentially available to MCOs in incentive payments keyed to specific quality-control objectives. Of this additional three percent of premium, one percent would be paid to those MCOs that achieved a certain level of data accuracy and "reduce[d] the lag time" between claimants' injuries and the MCO's report of those claims to the BWC. One percent of premium would be paid to those MCOs that participated in Phase 2 of the HPP implementation program by picking up additional claims. Finally, one percent of premium would be paid to those MCOs participating in Phase 3 of the implementation program. As of January 1, 1998, when the base administrative fee was increased to five percent, each MCO could qualify for only an additional one percent of premium in performance-incentive payments.

{¶ 11} As a result, an MCO that participated in all phases of the HPP implementation program and successfully achieved all of the BWC's quality-control objectives could earn administrative fees and performance-incentive payments totalling six percent of premium, to be paid from the SIF. The parties here do not dispute *how* the administrative fees and performance incentive payments are calculated in practice; rather, their appeal here centers on whether the use of SIF monies for these purposes is permissible at all.

III.  This Declaratory Judgment Action

**{¶ 12}** Appellees, Northwestern Ohio Building & Construction Trades Council and International Brotherhood of Electrical Workers, Local Union No. 8 (collectively, "Northwestern"), filed the instant action in June 1997, challenging several aspects of the HPP.  In its complaint, Northwestern sought two declarations from the trial court.  First, Northwestern sought a declaration that the HPP statutes and rules unconstitutionally delegate essential aspects of the administration of the SIF to private entities—including the determination of the terms and conditions upon which payments shall be made from the SIF.  Second, Northwestern sought a declaration that Ohio Adm.Code 4123-6-13, to the extent that it authorizes the use of the SIF for administrative and performance-incentive payments, was promulgated without statutory authority and violates Section 35, Article II of the Ohio Constitution and R.C. 4123.30.

**{¶ 13}** The parties eventually filed competing motions for summary judgment.  In a Decision and Entry filed September 9, 1998, the Franklin County Common Pleas Court sustained the BWC's motion for summary judgment.  The trial court determined that "the HPP statutory provisions do not unconstitutionally delegate authority and responsibility over the SIF," and that "the use of the SIF for HPP purposes is constitutional."

**{¶ 14}** Northwestern appealed to the Tenth District Court of Appeals, assigning as error the trial court's resolution of the same two claims raised in its complaint.  The court of appeals overruled Northwestern's first assignment of error on the authority of this court's decision in *Haylett,* 87 Ohio St.3d 325, 720 N.E.2d 901, noting that we had already determined that the HPP "does not constitute an improper delegation of authority to a private entity."

**{¶ 15}** In its second assignment of error, Northwestern contended that the use of SIF proceeds for the payment of administrative and performance-incentive fees under Ohio Adm.Code 4123-6-13 would contravene this court's holdings in

*Corrugated Container Co. v. Dickerson* (1960), 171 Ohio St. 289, 13 O.O.2d 337, 170 N.E.2d 255, and *Thompson v. Indus. Comm.* (1982), 1 Ohio St.3d 244, 1 OBR 265, 438 N.E.2d 1167. The court of appeals agreed, reversed the trial court's decision, and remanded the cause for an entry of summary judgment in favor of Northwestern. Construing *Corrugated Container* and *Thompson*, the court of appeals determined that the payment of SIF proceeds to MCOs as administrative fees and performance incentives violated Section 35, Article II of the Ohio Constitution, and that the Bureau lacked legislative authority to authorize these payments from the SIF in the first place. The bureau appealed, and the cause is now before this court upon the allowance of a discretionary appeal.

## IV. Analysis

{¶ 16} We shall address the BWC's propositions of law in reverse order because we should determine the validity of the administrative rule, as well as the BWC's interpretation of that rule, before we address any constitutional arguments related to the payments that the BWC has elected to make under the rule. If we were to agree with the court of appeals that the BWC lacked legislative authority to make these payments from the fund in the first instance, then we should decline to pass on any constitutional question implicated by those payments. See *Norandex, Inc. v. Limbach* (1994), 69 Ohio St.3d 26, 28, 630 N.E.2d 329, 331; *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28, 28 OBR 83, 90, 502 N.E.2d 590, 597, fn. 17.

### A. The Promulgation of Ohio Adm.Code 4123-6-13

{¶ 17} The General Assembly has delegated broad rulemaking authority to the administrator of workers' compensation. See, *e.g.,* R.C. 4121.121 and 4121.441. R.C. 4121.121 expressly permits the administrator to "[e]stablish the overall administrative policy of the bureau," R.C. 4121.121(B)(1), to "[e]nsure, by rules, the impartial and prompt treatment of all claims," R.C. 4121.121(B)(13), and

to "[p]repare and submit * * * recommendations, in the form of administrative rules, * * * for the health partnership program," R.C. 4121.121(B)(21).

{¶ 18} When the General Assembly enacted the HPP, it vested additional rulemaking authority in the administrator of workers' compensation tailored to the specific goals of that comprehensive program. See R.C. 4121.441(A). R.C. 4121.441(A) directs the administrator to "adopt rules * * * for the [HPP] administered by the [BWC] to provide medical, surgical, nursing, drug, hospital, and rehabilitation services and supplies to an employee."

{¶ 19} To guide the administrator's efforts in promulgating rules for administering the HPP, the General Assembly enumerated twelve nonexhaustive categories of rules that it deemed necessary for the effective implementation of the program. See R.C. 4121.441(A)(1) to (A)(12). One of these twelve subdivisions directs the administrator to adopt rules providing for "*[a]ppropriate financial incentives to reduce service cost and insure proper system utilization* without sacrificing the quality of service." (Emphasis added.) R.C. 4121.441(A)(4). Another directs the administrator to adopt rules ensuring "[a]dequate methods of *peer review*, *utilization review, quality assurance*, and dispute resolution." (Emphasis added.) R.C. 4121.441(A)(5).

{¶ 20} Ohio Adm.Code 4123-6-13(B) provides that MCOs shall be compensated for their "medical management and administrative services" based on "performance criteria" keyed to proper system utilization. Accordingly, it represents exactly the sort of administrative rule contemplated by the enabling language in R.C. 4121.441. In order to implement the HPP effectively, which it is statutorily required to do under R.C. 4121.441(B), the BWC must have the ability to promulgate, interpret, and enforce rules providing for performance-based compensation of those "integral" entities that perform the medical-management services called for under the program—the MCOs. See *Haylett,* 87 Ohio St.3d at 326, 720 N.E.2d at 903.

B.  The BWC's Reasonable Interpretation of Ohio Adm.Code 4123-6-13 and the
Workers' Compensation Statutory Scheme

**{¶ 21}** As Northwestern correctly notes, neither R.C. 4121.441 nor Ohio Adm.Code 4123-6-13 specifies the *source* of the administrative and performance-incentive payments to be made under the rule.  For the following reasons, however, we conclude that the BWC reasonably interpreted the statutory scheme when it decided to utilize SIF proceeds for these purposes.

**{¶ 22}** It is axiomatic that if a statute provides the authority for an administrative agency to perform a specified act, but does not provide the details by which the act should be performed, the agency is to perform the act in a reasonable manner based upon a reasonable construction of the statutory scheme. See *Swallow v. Indus. Comm.* (1988), 36 Ohio St.3d 55, 57, 521 N.E.2d 778, 779. A court must give due deference to the agency's reasonable interpretation of the legislative scheme.  *Id.*  See, also, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984), 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, 703 ("if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").

**{¶ 23}** In *Swallow*, a workers' compensation claimant awarded permanent partial and permanent total disability benefits for the loss of use of both arms and legs requested that his permanent partial benefits be paid concurrently rather than consecutively.  The statute at issue did not specify whether payments were to be made concurrently or consecutively.  Even so, this court unanimously concluded that "the commission had a reasonable basis upon which to formulate a policy premised on the rationale that claimants are generally placed in a better position by receiving payments consecutively rather than concurrently.  It was within the administrative purview of the commission to determine that appellant would be put in a better position by receiving eight hundred-fifty weeks of payments

consecutively rather than two two-hundred weeks of payments for loss of each leg and two two-hundred twenty-five weeks of payments for loss of each arm concurrently." *Id.* at 57, 521 N.E.2d at 780.

{¶ 24} We recognize that an agency can, at times, overstep the bounds of its statutorily delegated authority when interpreting and enforcing its administrative rules. In a recent case, the United States Supreme Court decided that the Army Corps of Engineers could not interpret and enforce its own "Migratory Bird Rule" so broadly as to provide the Corps with regulatory jurisdiction over ponds in abandoned gravel pits used as habitats by migratory birds, when the Clean Water Act authorized the Corps to regulate discharges only into "navigable waters." *Solid Waste Agency of N. Cook Cty. v. United States Army Corps of Engineers* (2001), 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576. In *Cook Cty.,* the majority decided that, in order to accept the Corps's broad interpretation of its own jurisdiction, the court would have to pretend that the word "navigable" contained in the enabling statute had "no effect whatever." *Id.* at ___, 121 S.Ct. at 683, 148 L.Ed.2d at 587-589. See, also, *Riley Family Trust v. Hood* (Colo.App.1994), 874 P.2d 503 (deciding that Department of Labor and Employment rule could not be interpreted to preclude payment for massage therapy prescribed by treating physician, when enabling statute authorized director to establish a fee schedule but did not grant authority to restrict treatment so long as the treatment was reasonable and necessary).

{¶ 25} In the present case, the General Assembly has not specified the source from which the BWC is to draw the funds necessary for the administrative and performance-incentive payments to be made to MCOs. The court of appeals found this legislative "gap" to be fatal, writing, "R.C. 4121.441(A)(4) is ambiguous in that it does not specifically authorize that these payments be made from SIF. *Lacking any clear legislative authorization, appellees were without the authority to authorize these payments from SIF*." (Emphasis added.)

**{¶ 26}** Unlike the court of appeals, we do not find the legislative gap equivalent to a lack of authority for the agency to act. As the United States Supreme Court has noted, "[t]he power of an administrative agency to administer a * * * program *necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly*," by the legislature. (Emphasis added.) *Morton v. Ruiz* (1974), 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270, 292. Our own *Swallow* case implicitly recognized that no set of statutes and administrative rules will answer each and every administrative concern. *Id.*, 36 Ohio St.3d 55, 521 N.E.2d 778. When agencies promulgate and interpret rules to fill these gaps, as they must often do in order to function, "courts * * * must give due deference to an administrative interpretation formulated by an agency that has accumulated substantial expertise, and to which the General Assembly has delegated the responsibility of implementing the legislative command." *Id.* at 57, 521 N.E.2d at 779. We accord due deference to the BWC's interpretation, so long as it is reasonable. See *State ex rel. McLean v. Indus. Comm.* (1986), 25 Ohio St.3d 90, 92, 25 OBR 141, 143, 495 N.E.2d 370, 372 (holding that commission did not abuse discretion in awarding compensation for loss of foot even though claimant suffered amputation five inches below the knee).

**{¶ 27}** We find that the BWC acted reasonably when it authorized the use of fund proceeds for the payments to MCOs provided under Ohio Adm.Code 4123-6-13. No provision of the workers' compensation scheme expressly prohibits this use, at least one provision of the scheme impliedly permits it, and both the General Assembly and this court have expressly permitted fund proceeds to be used for similar purposes in the past.

**{¶ 28}** Northwestern contends that the BWC's interpretation of its administrative rule cannot be a reasonable one because, in its view, R.C. 4123.30 "expressly prohibits the expenditure of premiums contributed to the state insurance fund for purposes other than the payment of compensation and benefits for loss

sustained on account of injury, disease or death compensable under the workers' compensation act." The court of appeals likewise determined that though R.C. 4123.30 lists various permissible uses of SIF proceeds, no provision of that statute expressly authorizes the use of fund proceeds as the BWC seeks to apply them under Ohio Adm.Code 4123-6-13. The appellate panel concluded that R.C. 4123.30 ensures that fund proceeds are "limited to compensating injured workers and their dependents for injuries and illness arising out of their employment." As we have done before, we decline to adopt these narrow interpretations of the fund's permitted applications. See *Thompson*, 1 Ohio St.3d at 248, 1 OBR at 268-269, 438 N.E.2d at 1170 (expressly declining to adopt a "narrow" or "cramped" interpretation of the fund's constitutionally permissible uses).

{¶ 29} R.C. 4123.30 provides that money from the SIF may be applied to "the payment of compensation, medical services, examinations, recommendations and determinations, nursing and hospital services, medicine, rehabilitation, death benefits, funeral expenses, and like benefits for loss sustained on account of injury, disease, or death provided for by this chapter, *and for no other purpose*." (Emphasis added.) In dicta, this court has previously stated that "[t]here is no provision for payment of administrative costs" from the fund under this statute. *Corrugated Container*, 171 Ohio St. at 291, 13 O.O.2d at 338, 170 N.E.2d at 256.

{¶ 30} Northwestern seizes on *Corrugated Container*'s dicta, the restrictive statutory language italicized above, and Ohio Adm.Code 4123-6-13's characterization of some of the payments to be made thereunder as "administrative" to contend that R.C. 4123.30 prohibits the BWC from making the rule's payments from the SIF. Superficially, Northwestern's position has merit. As Northwestern correctly notes, "the workers' compensation statutes have historically provided for a separate and distinct assessment for administrative costs." See R.C. 4123.341. Moreover, R.C. 4123.30 expressly enumerates a list of permissible uses of the SIF, this court has previously stated (in *Corrugated Container*) that administrative costs

are not among those enumerated uses, and R.C. 4123.30 expressly provides that the SIF is to be used for "no other purpose." Despite these valid observations, several factors suggest that the BWC has reasonably interpreted Ohio Adm.Code 4123-6-13 to allow the rule's payments to be made from the SIF.

{¶ 31} First, though Ohio Adm.Code 4123-6-13(B) provides for payment of an "administrative fee," this fee is expressly intended to compensate the MCOs for the "*medical management * * * services*" that they provide. (Emphasis added.) *Id.* The medical-management and cost-containment services performed by MCOs under the HPP differ from "the duties and * * * activities of * * * the bureau" for which an administrative cost and expense assessment is made under R.C. 4123.341. Compare R.C. 4121.44 and 4121.441 (outlining duties of MCOs under the HPP) with R.C. 4121.121 (outlining duties of the bureau and administrator).

{¶ 32} Further, R.C. 4123.30 expressly *permits* the SIF to be applied to "medical services, examinations, recommendations and determinations." As the BWC notes in its merit brief, "HPP administrative and performance and incentive payments are provided to MCOs for [their] medical recommendations. Each MCO has developed treatment guidelines. These guidelines guide MCOs and their providers in developing treatment plans for individual injured workers and * * * constitute medical recommendations." See Ohio Adm.Code 4123-6-032(E)(5). Because the payments provided to the MCOs under Ohio Adm.Code 4123-6-13 compensate those entities for "recommendations and determinations," they are not prohibited by R.C. 4123.30. In fact, a reasonable interpretation of R.C. 4123.30 would deem the payments to the MCOs from the fund as expressly *permitted* under that provision.

{¶ 33} Moreover, as this court has previously noted, SIF proceeds have historically been used for purposes other than the payment of direct disability compensation to claimants. *Thompson*, 1 Ohio St.3d at 248, 1 OBR at 268-269, 438 N.E.2d at 1170. Simply put, not every dollar of the fund has been applied

directly to the compensation of injured workers and their dependents, R.C. 4123.30 notwithstanding. In *Thompson*, we noted the past practice of SIF proceeds being applied to, *inter alia*, the creation of a surplus fund, set-asides for actuarial audits, costs for depositions and copies, and payments to medical specialists in certain occupational disease cases. *Id.* at 248, 1 OBR at 269, 438 N.E.2d at 1170, fn. 4. In other workers' compensation statutes, the General Assembly has expressly permitted fund proceeds to be used for some of the same types of compensation provided by Ohio Adm.Code 4123-6-13. By the time the General Assembly promulgated the HPP, it had previously authorized "reasonable compensation" from the fund to private entities who performed services comparable to those performed by MCOs under the HPP. See, *e.g.,* R.C. 4123.68(V), (W), and (Y) (permitting fund proceeds to be used as compensation for specialists who make examinations and recommendations before an award of benefits for berylliosis, certain diseases incurred by firefighters/police, and pneumoconiosis).

{¶ 34} As the MCO League notes in its *amicus curiae* brief supporting the appellants, the "medical management" services performed by MCOs under the HPP are simply a "generalized development of earlier instances of utilization review provided by external entities for the BWC." The BWC was entitled to rely on this historical practice when interpreting and applying the rules that it was delegated the authority to adopt under the HPP. It was reasonable for the BWC to conclude that the General Assembly provided it with the same authority to compensate MCOs for medical-utilization services under the HPP as the BWC had historically exercised to compensate outside vendors for similar services.

{¶ 35} This is not a case, such as *Cook Cty.*, *supra,* in which an agency ignored express terms contained in its enabling statute in order to expand broadly its own jurisdiction. See *id.*, 531 U.S. at ___, 121 S.Ct. at 683, 148 L.Ed.2d at 587-589. In that case, the Corps's interpretation of its Migratory Bird Rule rendered specific language in the Clean Water Act with "no effect whatever." *Id.* Here, on

the other hand, as in *Swallow*, 36 Ohio St.3d 55, 521 N.E.2d 778, and *Chevron*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, the agency's interpretation of Ohio Adm.Code 4123-6-13 has furthered the intent of the General Assembly in enacting the HPP and does not conflict with R.C. 4123.30. To the extent that the BWC's interpretation may conflict with this court's dicta in *Corrugated Container*, we disapprove of that dicta today.

### C. Constitutionality of the BWC's Interpretation

**{¶ 36}** Having decided that the BWC reasonably interpreted Ohio Adm.Code 4123-6-13 and the workers' compensation statutes to authorize the use of SIF proceeds for the administrative and performance-incentive payments provided under the rule, we now turn to the constitutional question. Despite this court's broadly worded syllabus in *Haylett,* 87 Ohio St.3d 325, 720 N.E.2d 901, that "[t]he managed care organization program enacted in R.C. 4121.44 and 4121.441 does not violate Section 35, Article II of the Ohio Constitution," the court of appeals in this case decided that the bureau's chosen method of compensating MCOs for their services under the very same program violated the very same constitutional provision. Assuming, *arguendo*, that our holding in *Haylett* was not broad enough to encompass the specific constitutional claim asserted here, we now clarify that the use of SIF proceeds for these purposes does not violate Section 35, Article II of the Ohio Constitution and reverse the court of appeals' judgment to the contrary.

**{¶ 37}** Section 35, Article II of the Ohio Constitution provides:

"For the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen's employment, laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state, determining the terms and conditions upon which payment shall be made therefrom."

**{¶ 38}** We have previously described this constitutional provision as "a broad grant of power to establish and to administer the fund *without limitation*." (Emphasis added.) *State ex rel. Michaels v. Morse* (1956), 165 Ohio St. 599, 603, 60 O.O. 531, 533, 138 N.E.2d 660, 663. Here, though, the court of appeals took a more limited approach to the constitutional provision and determined that "[a]s the Supreme Court held in *Corrugated* and reaffirmed in *Thompson*, funds from SIF can only be spent for the purposes enumerated in Section 35, Article II of the Ohio Constitution which, as noted above, *is limited to compensating injured workers and their dependents for injuries and illness arising out of their employment*." (Emphasis added.) We find that the court of appeals read Section 35, Article II too narrowly and misconstrued the relationship between our decisions in *Corrugated Container* and *Thompson*.

**{¶ 39}** In *Corrugated Container*, the precise issue before the court was "whether the state can take money which has been set aside for the payment of awards to injured workmen and * * * transfer it to the money comprising the General Revenue Fund of the state." *Id.*, 171 Ohio St. at 290, 13 O.O.2d at 337, 170 N.E.2d at 256. We held that the state could not constitutionally effect this diversion of fund proceeds. *Id.* at 291, 13 O.O.2d at 338, 170 N.E.2d at 256-257. As we later recognized in *Thompson*, transferring SIF proceeds to the state's general revenue fund creates a risk that the proceeds will be applied to purposes wholly unrelated to the workers' compensation system. See *id.*, 1 Ohio St.3d at 246-247, 1 OBR at 267, 438 N.E.2d at 1169-1170. Moreover, in *Corrugated Container,* this court struck down an Industrial Commission resolution requiring the SIF to reimburse the general revenue fund for *all* amounts appropriated for the commission's administrative costs, when that resolution conflicted with express provisions of the Revised Code requiring the SIF to reimburse only *two-thirds* of those costs. *Id.,* 171 Ohio St. 289, 13 O.O.2d 337, 170 N.E.2d 255.

**{¶ 40}** In *Thompson*, however, this court distinguished *Corrugated Container*, rejected the court of appeals' "cramped" reading of Section 35, Article II, and held that the transfer of SIF investment income to the Disabled Workers' Relief Fund ("DWRF") did *not* violate the constitutional provision. *Id.,* 1 Ohio St.3d at 246-248, 1 OBR at 267, 438 N.E.2d at 1169-1170. Writing for the majority, Justice A.W. Sweeney noted that "[t]he General Assembly is afforded substantial discretion to implement a comprehensive workers' compensation program and it is not the function of the judiciary to question the wisdom of the General Assembly's exercise of its permissive powers. * * * [T]o hold otherwise and declare the DWRF program as presently funded and administered unconstitutional makes a cruel mockery of the laudable purpose that the constitutional provision was designed to serve." *Id*. at 249, 1 OBR at 269, 438 N.E.2d at 1170.

**{¶ 41}** The same logic and the *Thompson* court's careful distinction of *Corrugated Container* inform our decision here. In *Thompson*, this court noted that "the transfer of SIF investment funds to the DWRF is qualitatively different from the diversion of SIF funds proscribed in *Corrugated Container*. The DWRF is an *integral component* of Ohio's comprehensive workers' compensation program and, therefore, the use of SIF investment income to fund the DWRF does not contravene the principle enunciated in *Corrugated Container*." (Emphasis added.) *Id.* at 247, 1 OBR at 267, 438 N.E.2d at 1169. In *Thompson*, this court expressly approved the use of SIF proceeds to fund an integral component of the workers' compensation scheme. With its interpretation of Ohio Adm.Code 4123-6-13, the BWC simply seeks to apply SIF proceeds to fund what this court has already described as an "integral part" of the HPP—the medical-management services performed by the MCOs. *Haylett*, 87 Ohio St.3d at 326, 720 N.E.2d at 903. As the trial court noted in this case, "it is uncontroverted that the SIF funds at issue are

being used in the HPP for purposes which relate to or are incidental to workers' compensation."

{¶ 42} For the foregoing reasons, we conclude that the court of appeals erroneously relied on *Corrugated Container* to reverse the trial court's grant of summary judgment in favor of the appellants. We hold that the use of premium contributions from the State Insurance Fund for the payment of administrative and performance-incentive fees under Ohio Adm.Code 4123-6-13 to managed care organizations certified by the Bureau of Workers' Compensation under the Health Partnership Program does not violate Section 35, Article II of the Ohio Constitution. We thus reverse the court of appeals' decision and reinstate the decision of the trial court.

*Judgment reversed.*

MOYER, C.J., PFEIFER and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., dissent.

_____

**ALICE ROBIE RESNICK, J., dissenting.**

{¶ 43} The majority finds the historical and dedicated purpose of the State Insurance Fund ("SIF") too "narrow" and "cramped" for its liking. Consequently, the majority approves the diversion of $140 million per year for administrative fees and performance bonuses to organizational claims managers from a trust fund that was established for injured workers. The SIF is the tangible representation of the essential compensation bargain that forms the workers' compensation system. It is constitutionally conceived, statutorily established, and judicially recognized as a trust fund for the benefit of injured Ohio workers and their dependents. Its quintessential purpose is to accumulate and reserve a sufficiently large sum of money to pay compensation and benefits to employees who suffer injury and disease, and to the dependents of employees who suffer death, in the course of their employment. After today, however, the premium contributions that compose the

18

SIF can be used generally for all "purposes which relate to or are incidental to workers' compensation," or "to fund an integral component of the workers' compensation scheme," and specifically "for the payment of administrative and performance incentive fees * * * to managed care organizations." Semantics aside, the majority has just changed the nature of the SIF in order to permit the Bureau of Workers' Compensation ("bureau") to tap its resources to pay administrative costs. I must dissent.

{¶ 44} Section 35, Article II of the Ohio Constitution provides:

"*For the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen's employment,* laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state, determining the terms and conditions upon which payment shall be made therefrom. * * * Laws may be passed establishing a board which may be empowered to classify all occupations, according to their degree of hazard, to fix rates of contribution to such fund according to such classification, and to collect, administer and distribute such fund, and to determine all rights *of claimants thereto.*" (Emphasis added.) See, also, R.C. 4123.29(A)(2), 4123.30, and 4123.46.

{¶ 45} The SIF and the net premiums contributed thereto constitute a trust fund to be used solely for the payment of compensation and benefits to injured workers and their dependents. See *State ex rel. Williams v. Indus. Comm.* (1927), 116 Ohio St. 45, 55, 156 N.E. 101, 104. See, also, R.C. 4123.29(A)(2), 4123.30, and 4123.46. "The Legislature throughout the legislation on this subject has studiously recognized this [constitutional] limitation, and it will be found in all the sections pertaining to the distribution of the fund that distribution is in fact limited to 'injured employe[e]s or to the dependents of such employe[e]s as may be killed.' " *State ex rel. Crawford v. Indus. Comm.* (1924), 110 Ohio St. 271, 277, 143 N.E. 574, 576, quoting several former sections of the General Code.

**{¶ 46}** In *Corrugated Container Co. v. Dickerson* (1960), 171 Ohio St. 289, 291, 13 O.O.2d 337, 338, 170 N.E.2d 255, 257, we specifically held that "[n]o part of the State Insurance Fund, a trust fund for the benefit of employers and employees, may be used for administrative purposes except as provided in Section 4123.342, Revised Code." R.C. 4123.342(A) provides that administrative costs are defrayed by a separate administrative assessment against amenable employers within certain designated classes, and R.C. 4123.341 defines "administrative costs" as "those costs and expenses that are incident to the discharge of the duties and performance of the activities of the industrial commission, the oversight commission, and the bureau under Chapters 4121. and 4123. of the Revised Code."

**{¶ 47}** It cannot be any clearer that the SIF, in its essential form and character, is a trust fund created by premium contributions that are set aside for and disbursed to employees who suffer loss on account of injury, disease, or death occasioned in the course of employment, and that it is not to be used for administrative purposes.

**{¶ 48}** Nevertheless, the majority views this basic principle as a "narrow" or "cramped" interpretation of the fund's permissible uses, and argues:

"First, though Ohio Adm.Code 4123-6-13(B) provides for payment of an 'administrative fee,' this fee is expressly intended to compensate the MCOs for the '*medical management * * * services*' that they provide. (Emphasis added.) *Id.* The medical-management and cost-containment services performed by MCOs under the HPP [health partnership program] differ from 'the duties and * * * activities of * * * the bureau' for which an administrative cost and expense assessment is made under R.C. 4123.341. Compare R.C. 4121.44 and 4121.441 (outlining duties of MCOs under the HPP) with R.C. 4121.121 (outlining duties of the bureau and administrator)." (Ellipses *sic*.)

**{¶ 49}** Nothing could be further from the truth. In the first place, Ohio Adm.Code 4123-6-13(B) actually provides that "[t]he bureau shall pay an MCO an

administrative fee for its medical management *and administrative services*." (Emphasis added.)

{¶ 50} Second, the administrative duties and activities of the bureau most certainly include medical-management and cost-containment services as set forth in R.C. 4121.121(B)(16) and (17). Indeed, Ohio Adm.Code 4123-6-44 amplifies R.C. 4121.121, 4121.44, and 4121.441 by providing that fees and methods of payment for practitioner services will be established in conjunction with "*the bureau's medical management and cost containment division*." (Emphasis added.)

{¶ 51} Third, the medical-management services provided by MCOs are just that, *management* services. They are not medical services. Medical services are provided by health care providers. A health care provider is "[a] physician or practitioner * * * or other legal entity licensed * * * and approved by the bureau, to provide particular medical services or supplies, including, but not limited to: a hospital, qualified rehabilitation provider, pharmacist, or durable medical equipment supplier." Ohio Adm.Code 4123-6-01(G). "*[A] managed care organization is not a health care provider.*" (Emphasis added.) Ohio Adm.Code 4123-6-01(C).

{¶ 52} Fourth, the HPP, by definition and design, is "*[t]he bureau of workers' compensation's comprehensive managed care program*." (Emphasis added.) Ohio Adm.Code 4123-6-01(A). Moreover, R.C. 4121.44(B)(3) provides that the bureau "*[m]ay integrate the certified vendors with bureau staff and existing bureau services for purposes of operation and training to allow the bureau to assume operation of the health partnership program at the conclusion of the certification periods*." (Emphasis added.) See, also, R.C. 4121.44(G).

{¶ 53} It is eminently clear that the majority's attempt to distinguish the services of MCOs from the duties and activities of the bureau creates a false dichotomy. Whether administered internally by the bureau or externally through contracts with private vendors, the HPP is essentially an administrative mechanism

for medical management and cost containment. The services performed thereunder by MCOs are precisely the duties and activities of the bureau for which a separate administrative cost assessment is required under R.C. 4123.341.

{¶ 54} The majority's second argument is that R.C. 4123.30 expressly authorizes, or at least does not prohibit, the use of SIF contributions to pay the administrative fees of MCOs. According to the majority, the development of treatment guidelines and individual treatment plans by MCOs constitutes "medical * * * recommendations and determinations" for which R.C. 4123.30 permits payment from the SIF.

{¶ 55} To put it mildly, this argument stretches the meaning of "medical * * * recommendations and determinations" under R.C. 4123.30 considerably beyond its contextual parameters. The authorized SIF expenditures enumerated in R.C. 4123.30 are bounded by language establishing the SIF as a trust fund for the payment of compensation and benefits to employees and their dependents who suffer loss on account of a compensable injury, disease, or death. The payment of a basic administrative and performance incentive fee equal to five percent of all SIF premiums contributed by each covered employer is neither "compensation" nor "benefit," and has nothing to do with a statute that provides for loss-replacement expenditures to injured workers. The development of treatment guidelines and plans by MCOs may be administratively necessary to facilitate the process of medical management and cost containment, but it is not medically necessary for the diagnosis or treatment of injury or disease, and certainly does not constitute a compensable loss to employees. Ohio Adm.Code 4123-6-043(B) provides that "[t]he MCO, in conjunction with the employer, employee, attending physician, and the bureau claims personnel assigned to the claim, shall seek a course of medical or rehabilitative treatment that promotes a safe return to work." If we follow the majority's reasoning, then the employer, employee, and the bureau's claims personnel could all be paid an administrative fee from the SIF for their

"recommendations and determinations" in developing treatment plans for injured workers. These guidelines and plans are administrative, not medical, recommendations and determinations. The administrative fee paid to MCOs under Ohio Adm.Code 4123-6-13(B) is still an administrative fee, and it can no more be wedged into the meaning of "medical * * * recommendations and determinations" under R.C. 4123.30 then it can be forced out of the definition of "administrative costs" under R.C. 4123.341.

{¶ 56} In its third argument, the majority relies on *Thompson v. Indus. Comm.* (1982), 1 Ohio St.3d 244, 248, 1 OBR 265, 268-269, 438 N.E.2d 1167, 1170, for the proposition that not every dollar of the SIF must be used as a direct disability compensation payment to claimants. The majority points out that certain provisions in R.C. Chapter 4123 expressly authorize SIF expenditures for "the creation of a surplus fund, set-asides for actuarial audits, costs for depositions and copies, and payments to medical specialists in certain occupational disease cases." According to the majority, the medical-management services performed by MCOs under the HPP are simply a generalized development of earlier instances of utilization review by outside entities and are particularly comparable to those services provided by independent medical specialists under R.C. 4123.68(V), (W), and (Y). Thus, the majority concludes, "[i]t was reasonable for the BWC to conclude that the General Assembly provided it with the same authority to compensate MCOs for medical-utilization services under the HPP as the BWC had historically exercised to compensate outside vendors for similar services."

{¶ 57} It is true, of course, that SIF disbursements do not always take the form of direct compensation payments to injured workers. But this does not mean that the SIF may be used to fund the administrative machinery of the workers' compensation system. Constitutional limitations aside, the fact that certain provisions in R.C. Chapter 4123 expressly authorize SIF disbursements for specific items of cost associated with the bringing of a claim or the upkeep of the fund does

not endow the bureau with such broad authority that it can use SIF assets to finance an entire administrative program created under R.C. Chapter 4121.

{¶ 58} In creating the HPP, the General Assembly conferred no authority to compensate MCOs out of the SIF. Contrary to the majority's assertions, this lack of authority does not translate into a "legislative gap" to be filled by the bureau. "Except for amounts earmarked for safety and hygiene, actuarial audits, specified costs and fees, and reinsurance premiums, the State Insurance Fund is a trust fund maintained for the benefit of employees and employers as a source of payment of compensation and benefits; it has no other purpose." Fulton, Ohio Workers' Compensation Law (2 Ed.1998) 378, Section 14.1. Moreover, when the General Assembly established the HPP as part of Am.Sub.H.B. No. 107, it also amended R.C. 4123.30 by removing an obsolete trust-fund exception for amounts set aside "for fees and costs authorized by section 4123.51 of the Revised Code," which had been repealed effective October 5, 1955. 145 Ohio Laws, Part II, 3115; 126 Ohio Laws 1015. Yet the General Assembly did not, in amended R.C. 4123.30 or elsewhere, purport to provide any authority for using SIF assets to defray the operating costs of the HPP. Thus, the court of appeals correctly found that "[l]acking any clear legislative authorization, [the bureau was] without the authority to authorize these payments from [the] SIF."

{¶ 59} In any event, the "utilization review" services performed by MCOs, like their other "medical management" services, are administrative in nature. R.C. 4121.441(A)(5) requires the administrator to adopt rules for the HPP that include "[a]dequate methods of * * * utilization review * * * to prevent, and provide sanctions for, inappropriate, excessive or not medically necessary treatment." Ohio Adm.Code 4123-6-01(U) defines "utilization review" as "[t]he assessment of an employee's medical care by the MCO. This assessment typically considers medical necessity, the appropriateness of the place of care, level of care, and the duration, frequency or quality of services provided in relation to the allowed condition being

treated." This is precisely the kind of review that the Workers' Compensation Act historically required the commission and bureau to perform as part of their administrative duties. See *State ex rel. Nutt v. Cincinnati* (1994), 70 Ohio St.3d 594, 639 N.E.2d 1196; *State ex rel. Breno v. Indus. Comm.* (1973), 34 Ohio St.2d 227, 63 O.O.2d 378, 298 N.E.2d 150; *State ex rel. Campbell v. Indus. Comm.* (1971), 28 Ohio St.2d 154, 57 O.O.2d 397, 277 N.E.2d 219.

{¶ 60} In particular, the utilization review services performed by MCOs are not comparable to the medical examinations and recommendations rendered by qualified medical specialists under R.C. 4123.68(V), (W), and (Y). MCOs conduct no x-ray, autopsy or other clinical examinations or tests, make no diagnostic or clinical findings, and perform no physical examinations of claimants. Instead, like the bureau, MCOs are authorized to obtain independent medical examinations to help resolve medical-management and treatment disputes. See Ohio Adm.Code 4123-6-043(G). Their utilization review has no actual medical component, and the fee paid by the bureau for these services constitutes an administrative cost for which a separate administrative assessment is required under R.C. 4123.341.

{¶ 61} Moreover, there is no statutory exception that authorizes the use of SIF proceeds for purposes of "medical utilization services," and the isolated provisions in R.C. Chapter 4123 upon which the majority relies do not cohere to allow for one to be judicially created. The costs of physician depositions (R.C. 4123.512[D]) and independent medical examinations (R.C. 4123.68[V], [W], and [Y]) are part of the expenses of a claim, while actuarial audits (R.C. 4123.30 and 4123.47[A]) and the creation of a Surplus Fund (R.C. 4123.34[B]), which is actually part of the SIF, *State ex rel. First Natl. Supermarkets, Inc. v. Indus. Comm.* (1994), 70 Ohio St.3d 582, 584, 639 N.E.2d 1185, 1188, are directly necessary to guarantee the solvency and fiscal integrity of the SIF. These provisions, which are quite specific in scope and purpose, simply do not conjoin to allow $140 million a

year to be taken from the SIF to pay for the administrative apparatus of medical management and cost containment.

{¶ 62} Finally, the majority finds that "the use of SIF proceeds for these purposes does not violate Section 35, Article II of the Ohio Constitution." The majority's supporting rationale for this finding has three components. First, the majority suggests that the constitutional question presented in this case can be disposed of under the authority of our syllabus in *State ex rel. Haylett v. Ohio Bur. of Workers' Comp.* (1999), 87 Ohio St.3d 325, 720 N.E.2d 901, where we held that "[t]he managed care organization program enacted in R.C. 4121.44 and 4121.441 does not violate Section 35, Article II of the Ohio Constitution." Although the issue of using SIF assets to fund the MCO program was never raised, discussed, decided, or even mentioned in *Haylett*, the majority insinuates that our holding in *Haylett* was "broad enough to encompass the specific constitutional claim asserted here."

{¶ 63} Aside from the obvious fact that the only Section 35, Article II issues addressed in *Haylett* were whether the MCO program constitutes an attempt to privatize the state's workers' compensation system and whether it causes delays and hardships that violate Section 35, the problem with the majority's argument is that the specific constitutional claim asserted in the present case has nothing to do with the constitutionality of the MCO program. Any decision in this case invalidating the bureau's present method of funding the MCO program would have no impact whatsoever on our decision in *Haylett* or the constitutionality of the MCO program. It would simply force the bureau to pay MCOs their administrative fee from an account that is not held in trust for the payment of compensation and benefits to injured workers and their dependents.

{¶ 64} In the second part of its constitutional analysis, the majority interprets *Corrugated Container* as holding only that SIF proceeds cannot be transferred to the general revenue fund because such a transfer "creates a risk that the proceeds will be applied to purposes wholly unrelated to the workers'

compensation system." However, our decision in *Corrugated Container* leaves no room for such an interpretation.

{¶ 65} *Corrugated Container* involved a challenge to certain provisions in the General Appropriation Act of 1959, which required that the SIF reimburse the General Fund for all amounts appropriated for administrative costs of the commission, and a commission resolution effectuating those provisions. Since former R.C. 4123.341 and 4123.342 had previously authorized the commission to collect only two-thirds of that amount from employers, the remaining one-third would have to come from money collected to pay awards of compensation. Our concern in *Corrugated Container* was that the SIF was being used to pay the administrative costs of the commission, and nothing in the opinion suggests that the court had any concern whatsoever with the funds being used for any purpose unrelated to the workers' compensation system. Our holding is quite clear that *"[n]o part of the State Insurance Fund, a trust fund for the benefit of employers and employees, may be used for administrative purposes except as provided in Section 4123.342, Revised Code*, and the Industrial Commission was without authority to adopt its resolution attempting to transfer money from the State Insurance Fund to the general fund in accordance with the appropriation act." (Emphasis added.) *Id.*, 171 Ohio St. at 291, 13 O.O.2d at 338, 170 N.E.2d at 257.

{¶ 66} In its third constitutional argument, the majority reasons:

"In *Thompson*, this court expressly approved the use of SIF proceeds to fund an integral component of the workers' compensation scheme. With its interpretation of Ohio Adm.Code 4123-6-13, the BWC simply seeks to apply SIF proceeds to fund what this court has already described as an 'integral part' of the HPP—the medical-management services performed by the MCOs. *Haylett*, 87 Ohio St.3d at 326, 720 N.E.2d at 903. As the trial court noted in this case, 'it is uncontroverted that the SIF funds at issue are being used in the HPP for purposes which relate to or are incidental to workers' compensation.' "

**{¶ 67}** In *Thompson*, we held that "[t]he transfer of State Insurance Fund investment income to the Disabled Workers' Relief Fund, pursuant to R.C. 4123.411, violates neither Section 35, Article II, nor Section 28, Article II of the Ohio Constitution." *Id.,* 1 Ohio St.3d 244, 1 OBR 265, 438 N.E.2d 1167, at the syllabus.

**{¶ 68}** The Disabled Workers' Relief Fund ("DWRF") was created in 1953 as a subsidy to certain recipients of workers' compensation. 125 Ohio Laws 506. "The creation of this subsidy was based upon the recognition that a large number of permanently and totally disabled claimants were receiving low levels of compensation, because benefits payable in a compensation claim are limited to those in effect at the time of injury, and inflation tended to victimize the recipients of such continuing benefits." Fulton, Ohio Workers' Compensation Law, *supra*, at 318, Section 10.6.

**{¶ 69}** R.C. 4123.412 creates the DWRF "[f]or the relief of persons who are permanently and totally disabled as the result of injury or disease sustained in the course of their employment and who are receiving workers' compensation which is payable to them by virtue of and under the laws of this state in amounts, the total of which, when combined with disability benefits received pursuant to the Social Security Act is less than three hundred forty-two dollars per month adjusted annually." These are also the eligibility requirements for a participant in the DWRF. R.C. 4123.413.

**{¶ 70}** The DWRF is obviously designed to pay supplemental benefits to a designated group of injured workers. "The recipients of the DWRF subsidy, namely those permanently and totally disabled employees who have previously been awarded workers' compensation, are clearly members of this designated group." *Thompson, supra*, 1 Ohio St.3d at 247, 1 OBR at 268, 438 N.E.2d at 1169. Thus, the DWRF is entirely consistent with the constitutionally enumerated

purpose of the SIF to provide compensation to workers who are injured in the course of their employment.

{¶ 71} As we explained in *Thompson*:

"The General Assembly is afforded substantial discretion to implement a comprehensive workers' compensation program and it is not the function of the judiciary to question the wisdom of the General Assembly's exercise of its permissive powers under Section 35, Article II, so long as these powers are used in furtherance of the constitutionally enumerated purpose. The DWRF subsidy received by eligible permanently and totally disabled workers infuses Section 35, Article II with a meaningfulness that is fully consistent with the goals that prompted the people of Ohio to approve Section 35, Article II in the first place. Indeed, to hold otherwise and declare the DWRF program as presently funded and administered unconstitutional makes a cruel mockery of the laudable purpose that the constitutional provision was designed to serve." *Id.*, 1 Ohio St.3d at 249, 1 OBR at 269, 438 N.E.2d at 1171.

{¶ 72} Accordingly, we agreed with the commission in *Thompson* that "the transfer of SIF investment funds to the DWRF is qualitatively different from the diversion of SIF funds proscribed in *Corrugated Container*. The DWRF is an integral component of Ohio's comprehensive workers' compensation program and, therefore, the use of SIF investment income to fund the DWRF does not contravene the principle enunciated in *Corrugated Container*." *Id.* at 247, 1 OBR at 267, 438 N.E.2d at 1169.

{¶ 73} The obvious distinction between *Corrugated Container* and *Thompson* lies in the qualitative difference between using SIF funds to pay for administrative costs and using SIF funds to provide compensation to workers who are injured in the course of their employment. It is in this sense that we considered the DWRF to be an integral component of the workers' compensation program in *Thompson*. It can hardly be considered the intent of this single sentence in

*Thompson* to change the nature of the SIF from a trust fund for the payment of compensation and benefits to injured workers to an all-purpose fund that can be used to pay the operating expenses of any constituent part of the entire workers' compensation system.

{¶ 74} The same qualitative difference between administrative costs and workers' compensation that led us to distinguish *Corrugated Container* in *Thompson* should now compel us to distinguish *Thompson*. While the medical-management services of the MCOs may be an " 'integral part' of the HPP," the HPP is qualitatively different from the DWRF. The DWRF program is established to pay supplemental compensation to injured workers; the HPP has no compensation component. Thus, the use of SIF contributions to fund the HPP contravenes the principle enunciated in *Corrugated Container*.

{¶ 75} For all of the foregoing reasons, the bureau acted without statutory or constitutional authority in diverting SIF contributions to pay administrative and performance incentive fees to MCOs under the HPP, and the judgment of the court of appeals should be affirmed.

DOUGLAS and F.E. SWEENEY, JJ., concur in the foregoing dissenting opinion.

————————————

*Gallon & Takacs Co., L.P.A., Theodore A. Bowman, Jack Gallon* and *John M. Roca,* for appellees.

*Betty D. Montgomery,* Attorney General; *Schottenstein, Zox & Dunn, L.P.A., Kris M. Dawley* and *Russell J. Kutell,* for appellants James Conrad and the Ohio Bureau of Workers' Compensation.

*Zeiger & Carpenter, John W. Zeiger, Marion H. Little, Jr.,* and *Ronald E. Laymon,* urging reversal for *amicus curiae* MCO League of Ohio.

*Stewart Jaffy & Assoc. Co., L.P.A., Stewart R. Jaffy* and *Marc J. Jaffy*, urging affirmance for *amicus curiae* Ohio AFL-CIO.

January Term, 2001

_____